(November 16, 1951.)

JOHN J. HARVEY et al., Surviving Partners Doing Business under the Name of
JOHN J. HARVEY COMPANY, Appellants-Respondents, v. STATE OF NEW YORK,
Respondent-Appellant. (Claim No. 30277.)

McCURN, J. (dissenting). The State has withheld payment to the contractor
of the sum of $9,583.32 to offset unemployment insurance tax credits which
became available to the contractor and his subcontractors under the provisions
of section 577 of the Labor Law. These credits were not determined until

some time after the contract was completed and became of benefit to the contractor and his subcontractors to reduce their unemployment insurance tax on any payrolls during the four successive calendar quarters thereafter. The Court of Claims properly held that such credits did not reduce the cost of the contract in question. A recovery of the amount of the tax credits upon payrolls under contract No. 8647 which the State withheld was denied, however, on the theory that a certain agreement (Exhibit 6-A) signed by the contractor and delivered to the State after the completion of the contract precluded such a recovery.

Exhibit 6-A reads as follows:

" RELEASE BY PRIME CONTRACTOR TO NEW YORK STATE

" Received from the State of New York the sum of Fourteen Thousand Seven Hundred Thirteen—78/100 being the final payment due John J. Harvey Company on account of its contract and extras with the State of New York Contract No. 8647 Mohawk College, Utica, New York, dated September 13, 1946. In consideration of this and prior payments, the John J. Harvey Company releases and forever discharge the said State of New York from any and all liability on account of said contract and extras.

*Rodney Hamelin—partner*
(Signature and Title)

" It is further agreed that the John J. Harvey Company will turn over to the State of New York any and all credits, refunds and discounts *taken advantage of and received by the John J. Harvey Company from the State Division of Placement and Unemployment Insurance* pursuant to Section 577 of the Labor Law and monies received by way of dividends, credits or refunds received from insurance companies.

" The amount to be turned over to the State of New York on account of credits received from the State Division of Placement and Unemployment Insurance will equal the percentage of the total credit received which the wages reimbursed by the State of New York under the contract bear to the total wages paid by the John J. Harvey Company during each year upon which credit is based.

" All such amounts to be turned over on account of credits, refunds and discounts shall be turned over within thirty days after they are received or taken advantage of.

" In Witness Whereof, the said John J. Harvey Company has hereunto set its hand and seal signed by its Partner this 1 day of December in the Year One Thousand Nine Hundred and Forty Seven.

" Sealed and Delivered in the Presence of

*Rodney Hamelin—partner*

*George L. Mireault."* (Emphasis supplied.)

It will be noted that the agreement relates to credits received and taken advantage of by the *John J. Harvey Company from the State Division of Placement and Unemployment Insurance.* It does not expressly or by inference, as I read it, include credits received by any of Harvey's subcontractors from the State Division of Placement and Unemployment Insurance even though Harvey's subcontractors had executed similar agreements running to Harvey on forms apparently furnished by the State. The State's representatives appear to have so construed Harvey's agreement for at a later date they requested Harvey to execute another agreement containing in addition to the provisions contained in Exhibit 6-A an agreement on Harvey's part to turn

over to the State all credits received by Harvey's subcontractors, together with a surety bond to insure his performance. Harvey refused to sign the new agreement and the State in turn refused to pay over the remaining balance of $5,000 of the money for which Harvey receipted in Exhibit 6-A.

The $9,583.32 in controversy consists of unemployment insurance tax credits to the Harvey Company in the amount of $4,110.65 on wages paid by Harvey to his employees and like credits to the subcontractors aggregating $5,472.67 upon wages paid by the various subcontractors. Since the credits to the subcontractors were not included in the contract 6-A, that contract is no bar to the claimant's recovery of $5,472.67 of the amount in controversy. The question remains as to whether or not it is a bar to the recovery of $4,110.65 withheld by the State to offset his own tax credits.

That contract should be construed in the light of the circumstances existing at the time it was executed. The contractor had completed his work on contract No. 8647 and it was apparently accepted by the State on December 1, 1947, the day on which Exhibit 6-A is dated. Prior to that date the State had notified the contractor that any credits received applicable to payrolls on the State contracts should be returned to the State. The parties presumably knew that by virtue of the provisions of section 577 of the Labor Law the amount of any credits taken advantage of by the contractor could not be ascertained until the expiration of a year after September 30th of the next year following the payrolls. When claimant signed Exhibit 6-A he receipted in advance for the final payment on the cost element of his contract. It appears that in the ordinary course of business between the State and contractor the contractor would receive the moneys receipted for, as soon as the State compiled its so-called post-audit.

Claimant was thus faced with a situation where if the State was to deduct from the final payment the amount of his unemployment insurance tax credits, the final payment would be held up for a considerable period until the amount of the credit was known. It subsequently developed that the amount of these credits was not ascertained until February, 1950. Within a few days after Exhibit 6-A was executed the State paid the contractor $9,713.78 of the amount receipted for, reserving $5,000 to cover any discrepancies which might develop in the post-audit. While the post-audit report was revised from time to time down to about February, 1950, still a substantial part of the $5,000 withheld was concededly owing to the contractor. In March, 1948, the State mailed to the contractor a proposed new agreement with respect to the unemployment insurance tax credits. That agreement contained the substance of Exhibit 6-A and in addition thereto a provision that the contractor would turn over to the State all unemployment insurance tax credits received by and taken advantage of by his subcontractors. It also contained the additional provisions that the contractor would post a bond in the sum of $14,000 to insure the turning over to the State of all tax credits recovered and taken advantage of by the contractor and his subcontractors. The claimant refused to sign the proposed new agreement. On June 18, 1948, and on June 29, 1948, the State informed the contractor by letters that it could make no further payments unless Harvey executed the new agreement and furnished the bond therein provided for. On June 23, 1948, Harvey notified the State by letter that he would not sign the new agreement or furnish the bond provided for therein and moreover that he would not accept any further payment upon condition that he would return the tax credits to the State. Thus it would appear that both Harvey and the State by their acts abandoned the former contract — Exhibit 6-A. There **appears to have been a mutual abandonment and rescission of that agreement.**

The receipt, release and agreement constituting Exhibit 6-A were prepared by the State and appear on a single sheet of paper and must be read together. Read in the light of the circumstances existing at the time they were signed by Harvey, it is readily apparent that Harvey's agreement to turn over to the State the tax credits thirty days after the receipt thereof, was in contemplation that Harvey should first receive from the State the moneys for which he had receipted, according to the usual practice following the post-audit. That was clearly a condition precedent to his agreement. The State's unsuccessful attempt to persuade the contractor to execute a new agreement requiring a surety bond from the contractor to insure turning the tax credits over to the State and the State's letters of June 18 and June 29, 1948, above mentioned, clearly indicates that the State so construed Exhibit 6-A. The State having refused to meet the condition of payment and both parties thereafter having taken a position inconsistent with the receipt, release and agreement, the State is in no position now to revive the agreement and assert it as a bar to the contractor's recovery. "It is a well-settled principle of law in the construction of contracts that when the obligation of performance by one party presupposes the doing of some act on the part of the other prior thereto, that the neglect or refusal to perform such act not only dispenses with the obligation of performance by the other, but also entitles him to rescind * * *. (*Cross* v. *Beard*, 26 N. Y. 85, 88.) " (*Mansfield* v. *New York Central & H. R. R. R. Co.*, 102 N. Y. 205, 211. See, also, *Starbird* v. *Barrons*, 38 N. Y. 230, 237; *Callanan* v. *Keeseville*, *A. C. & L. C. R. R. Co.*, 199 N. Y. 268, 284.)

I reach the conclusion that the rights of the parties are now governed by the original contract and that Exhibit 6-A which the claimant signed is not a bar to the recovery of the sum represented by the tax credits.

I therefore dissent and vote to increase the judgment in favor of claimant by adding thereto the sum of $9,583.32.

All concur in decision except McCurn, J., who dissents and votes to increase the award to claimants by adding thereto the sum of $9,583.32, in an opinion. Present — Taylor, P. J., McCurn, Vaughan, Piper and Wheeler, JJ.

Judgment affirmed, without costs of this appeal to any party. [200 Misc. 233.]